**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **APPALACHIAN VOICES and SIERRA CLUB,**<br>***Plaintiffs***<br><br>**v.**<br><br>**TENNESSEE VALLEY AUTHORITY and CUMBERLAND COMBINED CYCLE GENERATION, LLC,**<br><br>***Defendants.*** | **Civil Case No.** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Appalachian Voices and the Sierra Club (collectively, "Plaintiffs") hereby file this Complaint for declaratory and injunctive relief against Defendants Tennessee Valley Authority ("TVA") and Cumberland Combined Cycle Generation, LLC and state the following:

## I. INTRODUCTION

1. TVA's Cumberland Coal Plant looms above a bend in the Cumberland River in Stewart County, Tennessee. It has been operating since 1973 and remains the largest coal plant in the TVA system.

2. The Cumberland Coal Plant has been subject to numerous regulatory enforcement actions and litigation seeking to address TVA's repeated Clean Air Act violations.

3. Community members living in the shadow of the smokestacks have long advocated for TVA to retire the Cumberland Coal Plant because of its harmful pollution.

4. Those communities celebrated when, in 2023, after a multi-year process to evaluate the viability of continued operation of its aging coal fleet, TVA decided to retire one coal-fired

boiler at the Cumberland Coal Plant by the end of 2026 and the other coal-fired boiler by the end of 2028.

5. When TVA finalized its decision to retire the Cumberland Coal Plant, it also announced its plan to build the Cumberland Gas Plant nearby on the 2,388-acre Cumberland Reservation. The Cumberland Gas Plant consists of two new methane gas-fired combined-cycle electric generating units, two new gas-fired boilers, three new gas-fired fuel heaters, two modified oil-fired boilers, and other ancillary equipment.

6. TVA proposed a tradeoff. In exchange for its promise to substantially reduce total emissions of air pollutants from facilities located on the Cumberland Reservation by retiring the entire Coal Plant by the end of 2028, TVA sought to classify the new Gas Plant as a "minor" modification of the retiring Coal Plant.

7. Specifically, TVA proposed subtracting the Coal Plant's historical emissions from the Gas Plant's potential emissions, such that any net emissions increase caused by the Gas Plant would be "minor." Thus, based on its promise to permanently close the Coal Plant, TVA proposed to construct and operate the Gas Plant without complying with the heightened air quality protections and public participation requirements that apply to new major stationary sources and major modifications under the Clean Air Act.

8. The Tennessee Department of Environment and Conservation ("TDEC") accepted TVA's proposal, and the Technical Secretary of the Tennessee Board of Air Pollution Control permitted TVA's construction of the Cumberland Gas Plant as a minor modification of the Cumberland Coal Plant, conditional on the idling of one coal-fired boiler upon operation of the new Gas Plant and the permanent retirement of both coal-fired boilers no later than December 31, 2028.

9. But in February 2026, as construction of the Cumberland Gas Plant was nearing completion, TVA broke its promise: the federal utility announced it would continue operating the Cumberland Coal Plant beyond the 2028 retirement date and alongside the new Gas Plant.

10. TVA's unilateral decision to change course rendered its minor modification air permit for the Gas Plant invalid because it nullified the factual premise the permitting agency had expressly relied upon—that the Gas Plant's emissions would be largely offset by the substantial reduction in emissions that would result from shutting down the Coal Plant.

11. If construction of the Gas Plant is a modification of the Coal Plant that is no longer retiring, the increased emissions associated with operating the Gas Plant alongside the Coal Plant are significant enough that they require review under the Clean Air Act's Prevention of Significant Deterioration ("PSD") program as a "major modification" of an existing major stationary source of air pollution. If the Gas Plant and Coal Plant are separate sources, the Gas Plant's emissions are also significant enough to require PSD review as a new major stationary source. Either way, construction of the new Gas Plant requires a PSD permit.

12. The Cumberland Gas and Coal Plants together have the potential to emit thousands of tons per year of harmful pollutants such as particulate matter, sulfur dioxide, nitrogen oxides, and smog-forming volatile organic compounds, all of which are tied to adverse health effects.

13. TVA has acknowledged that its decision to continue operating the Cumberland Coal Plant beyond 2028 and alongside the new Gas Plant requires a PSD permit. In fact, TVA submitted a PSD permit application for the new Gas Plant on May 20, 2026, which TDEC has since deemed incomplete. Yet TVA did not pause its ongoing construction of the Gas Plant and even began operating multiple new emission units, including the new turbines, without the requisite PSD permit.

14. By failing to undergo the appropriate preconstruction review for the Gas Plant as a new major source or major modification, TVA avoided evaluating and applying emission limits that reflect the maximum degree of emissions reduction achievable using up-to-date pollution control technologies and processes, known as the best available control technology ("BACT"). The now-invalid minor modification permit that TVA obtained as a tradeoff for retiring the Coal Plant does not impose such emission limits. TVA's ongoing operation of the new turbines and other new emission units at the Cumberland Gas Plant thus violates federal and state requirements to continuously comply with BACT-level emission limits.

15. By failing to undergo the appropriate preconstruction review for the Gas Plant as a new major source or major modification, TVA also avoided performing preconstruction air quality monitoring and air dispersion modeling to evaluate whether its increased emissions could cause or contribute to air pollution in excess of any national ambient air quality standards or otherwise significantly degrade air quality. TVA's ongoing operation of the new turbines and other new emission units at the Cumberland Gas Plant alongside the aging Coal Plant thus poses a risk of exposing nearby residents to levels of air pollution that exceed federal health-based standards.

16. Had TVA applied for and obtained a PSD permit before beginning construction of the new Gas Plant, TDEC would have been required to provide a meaningful opportunity for the public to participate in the permitting process before TVA's proposed design was approved and constructed. Instead, TDEC only accepted public comments on TVA's application and provided no opportunity for public review or input on the agency's analysis or proposed permit conditions.

17. Then, once construction was nearly complete, TVA unilaterally decided to put the communities surrounding the plant at risk of exposure to significant increases in harmful air pollution from the operation of both plants without providing any opportunity for meaningful

public review and input. These communities will bear the brunt of adverse health effects, increased healthcare costs, and diminished enjoyment of outdoor activities due to their concerns about being exposed to increased air pollution.

18. TVA has estimated that continuing to operate the Cumberland Coal Plant beyond 2028 will require an investment of hundreds of millions of dollars in life-extending renovations, yet TVA did not include these modifications in the PSD permit application it submitted in May 2026.

19. To protect the health and welfare of their members who live, work, and/or recreate in areas that will be impacted by air pollution emitted from the Cumberland Gas and Coal Plants, Appalachian Voices and Sierra Club seek declaratory and injunctive relief to rectify TVA's violations of federal and state law. Specifically, Plaintiffs seek (1) a declaratory judgment that TVA violated and continues to violate the Clean Air Act and Tennessee's federally enforceable State Implementation Plan; (2) an injunction ordering TVA to halt its ongoing construction and operation of new emission units at the Cumberland Gas Plant until it completes the required preconstruction monitoring, source impact analysis, and BACT analyses and obtains a final PSD permit with enforceable BACT emission limits reflective of the maximum emissions reductions achievable; and (3) an order requiring TVA to pay appropriate civil penalties for each day of each violation, as well as Plaintiffs' costs of litigation including reasonable attorney and expert witness fees.

20. Absent such declaratory and injunctive relief from this Court, TVA will continue to emit air pollution in violation of federal and state law as described in this Complaint, which will continue to harm the health and welfare of members of Appalachian Voices and the Sierra Club.

## II. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

22. On June 25, 2026, in accordance with 42 U.S.C. § 7604(b)(1)(A) and 40 C.F.R. pt. 54, Plaintiffs' counsel provided notice of the violations alleged in this Complaint by sending a letter via certified mail to Defendants, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator for EPA Region 4, the Acting Attorney General of the United States, the Technical Secretary of the Tennessee Air Pollution Control Board, TDEC, and the Governor of the State of Tennessee. *See* **Ex. A**, Letter from Caroline Cress et al., S. Env't L. Ctr., to Mike Skaggs, Tenn. Valley Auth. et al. (June 25, 2026).

23. More than sixty days have passed since Plaintiffs' counsel served the required notice on June 25, 2026. 42 U.S.C. § 7604(b)(1)(A).

24. Neither the EPA Administrator nor the State of Tennessee has commenced or is diligently prosecuting any civil action in federal or state court to require compliance with any emission standard or limitation that this Complaint alleges TVA violated or is violating. 42 U.S.C. § 7604(b)(1)(B).

25. This Court has jurisdiction to grant the requested declaratory and injunctive relief, apply any appropriate civil penalties, and award costs of litigation (including reasonable attorney and expert witness fees) to Plaintiffs. 42 U.S.C. § 7604(a), (d); 28 U.S.C. §§ 2201(a), 2202, 1355(a).

26. Venue is proper in the U.S. District Court for the Middle District of Tennessee because the Cumberland Fossil Plant, the stationary source at which the violations alleged herein have occurred and are occurring, is located within this judicial district. 42 U.S.C. § 7604(c)(1); 28 U.S.C. § 1391(b)(2).

## III. PARTIES

### A. Plaintiffs

27. Plaintiffs Appalachian Voices and Sierra Club are non-profit organizations with members who live, work, and/or recreate in areas impacted by emissions from the Cumberland Gas and Coal Plants and who are and/or will be adversely impacted by being exposed to the air pollution resulting from the continued operation of the Coal Plant and the construction and operation of the Gas Plant.

28. Plaintiff Appalachian Voices is a grassroots non-profit organization dedicated to bringing people together to protect the land, air, and water of Central and Southern Appalachia and to advance a just transition to a generative and equitable clean-energy economy. Appalachian Voices works collaboratively with local, state, and regional partners to promote energy efficiency and encourage the development of clean and affordable energy. For example, Appalachian Voices meets with TVA and TVA-area distribution utilities to advocate for clean energy and supports communities across the region to help them organize and plan advocacy campaigns related to the energy choices of TVA and distribution utilities.

29. Clean air is of paramount importance to the health and well-being of the members of Appalachian Voices, and it has an established history of clean air advocacy across Tennessee, including citizen air quality monitoring.

30. Appalachian Voices is headquartered in Boone, North Carolina, and has additional offices in Knoxville, Tennessee; Charleston, West Virginia; and Charlottesville and Norton, Virginia.

31. Appalachian Voices has more than 100 members who reside in Tennessee.

32. Appalachian Voices is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

33. Plaintiff Sierra Club is a national non-profit organization with nearly 600,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

34. Clean air is of paramount importance to the health and well-being of the members of the Sierra Club, and it has an established history of clean air advocacy across Tennessee.

35. Sierra Club is headquartered in Oakland, California, and has Chapters throughout the country.

36. The Sierra Club has more than 7,000 members who reside in Tennessee.

37. The Sierra Club is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

38. Appalachian Voices and the Sierra Club are dedicated to protecting healthy ambient air quality for all Tennesseans.

39. Appalachian Voices and the Sierra Club each have members who are exposed or face the threat of exposure to air pollution from the Cumberland Coal and Gas Plants because they live, work, and/or recreate in areas impacted by emissions from these facilities. These members are concerned about the effects of the emissions of both Plants on their health and their families' health, the profitability of their businesses, and their ability to enjoy spending time outdoors at their homes and at parks and other recreational sites near the Plants and across Tennessee.

40. Since learning about TVA's decision to continue operating the Cumberland Coal Plant beyond 2028 and alongside the new Gas Plant, members of Appalachian Voices and Sierra

Club have grown concerned about the impacts of the combined operation of both Plants at the site, particularly when spending time outside.

41. For example, Appalachian Voices Member A, a biology professor and organizer for Appalachian Voices, lives about eight miles from the Plants on her family farm in rural Montgomery County. She is exposed to air pollutants emitted from the Plants on a daily basis, including when she is outside recreating and taking care of responsibilities on the farm. From the farm, she can see the visible air pollution being emitted from the Coal Plant.

42. This Appalachian Voices member is concerned about how her regular exposure to air pollution from the Plants will affect her health and welfare. She already experiences the impacts of worsening air quality, which makes it harder for her to breathe, and she is concerned that the cumulative air pollution from the Plants will deteriorate the air she breathes even further. Those concerns diminish her ability to enjoy her time on the farm the way she otherwise would.

43. This Appalachian Voices member also regularly visits state parks in the area, including Montgomery Bell State Park, and is concerned that increased air pollution from the Plants will worsen haze and diminish her enjoyment of the scenic views in these parks.

44. TVA's failure to undergo major New Source Review before constructing the Cumberland Gas Plant deprived this Appalachian Voices member of information about its impacts on air quality and the opportunity to voice her concerns about those impacts. She regularly attends public meetings and participates in public comment periods. If there had been an opportunity for the public to review and comment on TVA's analysis of the gas plant's air quality impacts, she would have also encouraged her neighbors to provide comments.

45. If TVA reduced or eliminated the air pollution from the Cumberland Gas Plant and/or Coal Plant, this Appalachian Voices member's health concerns would be reduced, and her enjoyment of the outdoors would be restored.

46. Appalachian Voices Member B grew up on a farm in Cumberland Furnace less than ten miles southeast of the Plants. He visits his family who still live on this farm several times each year. When he visits, he enjoys working outside with the goats and cows, helping grow hay, viewing native wildlife, and hunting. He also enjoys spending time with his grandparents outside on the porch, in the pool, and in the garden.

47. This Appalachian Voices member is concerned about how his exposure to increased air pollution from the Plants during these visits to his family farm will affect his health and welfare. Those concerns diminish his ability to enjoy his time on the farm the way he otherwise would. He is also concerned about the health of his grandparents, who are exposed to increased air pollution from the Plants on a daily basis and are particularly vulnerable due to their age, and for his father, whose job requires him to work outside.

48. When this Appalachian Voices member visits his family in Cumberland Furnace, he also enjoys kayaking and birdwatching at the Cross Creeks National Wildlife Refuge, which is less than seven miles northwest of the Plants. He and his family also spend time at a lake house on Kentucky Lake, approximately twenty miles west of the Plants, where they swim, paddle, and fish. He is concerned that increased air pollution from the Plants will worsen haze and diminish his enjoyment of the scenic views in these special places.

49. This Appalachian Voices member is interested in learning more about how the Plants' emissions impact his family's farm. TVA's failure to undergo major New Source Review before constructing the Cumberland Gas Plant deprived him of this information.

50. Sierra Club Member A, a retired biology professor and member of the Sierra Club, lives with his wife on a 78-acre farm approximately 22 miles northeast of the Plants. He and his wife spend time outside nearly every day working to operate their farm, and they spend extensive time outside fishing and birdwatching both on their farm and at the Cross Creek National Wildlife Refuge, which is less than seven miles northwest of the Plants. They run a U-pick berry farm that allows customers to visit their farm and pick fruit themselves.

51. This Sierra Club member worries that exposure to air pollution from the Plants will harm the health and welfare of himself his wife. These concerns diminish his ability to enjoy the time he spends outdoors the way he otherwise would.

52. This Sierra Club member is further concerned about the profitability of his U-pick berry farm. Poor air quality makes his farm a less desirable place for customers to visit, especially for families with young children who are particularly vulnerable to air pollution.

53. If TVA reduced or eliminated the air pollution from the Cumberland Gas Plant and/or Coal Plant, this Sierra Club member's health concerns for himself, his wife, and his customers would be reduced, his enjoyment of the outdoors would be restored, and he would worry less about the profitability of his farm.

**B. Defendants**

54. Defendant TVA is a public utility and corporate agency of the United States.

55. TVA maintains physical headquarters at 400 West Summit Hill Drive in Knoxville, Tennessee and at 1101 Market Street in Chattanooga, Tennessee.

56. TVA is the owner of the 2,388-acre property known as the Cumberland Reservation, located at 815 Cumberland City Road, Cumberland City, Stewart County, Tennessee 37050.

57. TVA operates the Cumberland Coal Plant and the Cumberland Gas Plant, which are both located at the Cumberland Reservation, 815 Cumberland City Road, Cumberland City, Stewart County, Tennessee 37050.

58. TVA is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a)(1), (a)(3).

59. TVA is a "department, agency, [or] instrumentality" of the federal government within the meaning of the Clean Air Act's waiver of sovereign immunity under 42 U.S.C. § 7418(a).

60. Under the Tennessee Valley Authority Act of 1933, TVA "[m]ay sue and be sued in its corporate name." 16 U.S.C. § 831c(b).

61. At all times relevant to the violations alleged in this Complaint, TVA has controlled the operation of the Cumberland Coal Plant and the construction and operation of the Cumberland Gas Plant.

62. Defendant Cumberland Combined Cycle Generation, LLC, ("Cumberland LLC"), is a special single-purpose limited liability company incorporated in the state of Delaware on February 11, 2026.

63. Cumberland LLC's registered agent is Cogency Global Inc., located at 850 New Burton Road, Suite 201, in Dover, Delaware.

64. Cumberland LLC is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a)(1), (a)(3).

65. Cumberland LLC owns a leasehold interest in the Cumberland Gas Plant located at the Cumberland Reservation, at or near 815 Cumberland City Road, Cumberland City, Stewart County, Tennessee 37050.

66. Upon information and belief, since at least May 26, 2026, Cumberland LLC has held an ownership interest in the structures and equipment that comprise the Cumberland Gas Plant pursuant to a fifty-year lease agreement with TVA ("Head Lease").

67. Pursuant to a separate but related contract between TVA and Cumberland LLC dated May 26, 2026 ("Construction Management Agreement"), TVA is restricted from making any material modifications to the features or specifications of the Cumberland Gas Plant without the written consent of Cumberland LLC.

## IV. STATUTORY FRAMEWORK

68. The Clean Air Act is a broad remedial statute that Congress enacted to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).

69. The Clean Air Act requires EPA to establish regulatory requirements for emissions of certain air pollutants, referred to as "criteria pollutants," which "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7408, 7409. Emissions of many other pollutants not designated as "criteria pollutants" are also regulated under the Clean Air Act. *See, e.g.*, 42 U.S.C. § 7412; 40 C.F.R. § 51.166(b)(23), (b)(49).

70. "Criteria pollutants" include nitrogen oxides ("$NO_X$"), particulate matter with a diameter of 10 microns or less ("$PM_{10}$"), particulate matter with a diameter of 2.5 microns or less ("$PM_{2.5}$"), carbon monoxide ("CO"), sulfur dioxide ("$SO_2$"), ozone, and lead. 40 C.F.R. §§ 50.4–.21.

71. EPA must establish allowable concentrations of criteria pollutants in the outdoor air, known as National Ambient Air Quality Standards ("NAAQS"). "Primary" NAAQS must be set at levels "requisite to protect the public health," while "allowing an adequate margin of safety." 42 U.S.C. § 7409(b)(1).

72. Most primary NAAQS are designated as annual not-to-exceed levels, hourly or daily not-to-exceed levels, or both. *See* 40 C.F.R. §§ 50.4 ($SO_2$), 50.6 ($PM_{10}$), 50.7 ($PM_{2.5}$), 50.8 (CO), 50.9–.10 (ozone), 50.11 ($NO_X$).

73. EPA must review and, as appropriate, revise the NAAQS every five years. 42 U.S.C. § 7409(d)(1). Within two years of adopting a new or revised NAAQS, EPA must promulgate "designations" identifying all areas of the country as either meeting or violating the new or revised standard. *Id.* § 7407(d)(1)(B)(i).

74. EPA designates an area as "nonattainment" if the area does not meet the applicable standard or "contributes to ambient air quality in a nearby area that does not meet" the standard. 42 U.S.C. § 7407(d)(1)(A)(i). EPA designates an area as "attainment" if the area meets the standard and does not contribute to a violation of the standard in a nearby area. *Id.* § 7407(d)(1)(A)(ii). An "unclassifiable" area is "any area that cannot be classified on the basis of available information as meeting or not meeting" the standard and is treated for regulatory purposes as an attainment area. *Id.* §§ 7407(d)(1)(A)(iii), 7471.

75. Each State must develop a State Implementation Plan ("SIP") setting forth how the NAAQS will be achieved and maintained within the state.

76. SIPs must be submitted to and approved by the EPA pursuant to statutory criteria and a public process. 42 U.S.C. § 7407(a).

77. Through SIPs, state agencies are responsible for ensuring compliance with federal air quality standards. 42 U.S.C. §§ 7410(a)(2)(A), 7502(c)(6).

78. Once approved by EPA, the provisions of a SIP are federally enforceable by EPA and members of the public under the Clean Air Act's citizen suit provision. *See* 42 U.S.C. §§ 7413, 7604.

79. The provisions that EPA has approved and incorporated into Tennessee's SIP are identified in 40 C.F.R. § 52.2220.

### A. New Source Review and Prevention of Significant Deterioration Programs

80. Congress amended the Clean Air Act in 1977 to create the New Source Review program, which establishes minimum requirements for the regulation of new and modified stationary sources of air pollution. The central premise of New Source Review is that no owner or operator can build or expand a major source of air pollution before evaluating the proposed source's potential impacts on ambient air quality (by gathering preconstruction air monitoring data and performing air dispersion modeling), evaluating and implementing up-to-date pollution control technologies to reduce emissions to the maximum degree achievable, and obtaining a preconstruction permit with enforceable conditions that prevent the proposed source from significantly deteriorating air quality. 42 U.S.C. §§ 7470–7492.

81. The Clean Air Act and its implementing regulations include two programs governing major new sources and major modifications of existing major sources, which, together, are referred to as major New Source Review: the Prevention of Significant Deterioration ("PSD") program, which applies to increases in emissions of pollutants for which an area is designated as "attainment" or "unclassifiable" for the applicable NAAQS; and the Nonattainment New Source Review program, which applies to increases in emissions of pollutants for which an area is designated "nonattainment" for the applicable NAAQS. 42 U.S.C. §§ 7470–7492.

#### 1. New major sources and modifications of major sources that cause significant net emissions increases must comply with major New Source Review requirements.

82. The Clean Air Act requires that SIPs include a PSD program requiring preconstruction analyses and rigorous permitting requirements for new major stationary sources and major modifications at existing major sources. 42 U.S.C. §§ 7410(a)(2)(D)(i)(II), 7475(a).

83. Two key purposes of the PSD program are to "protect public health and welfare from any actual or potential adverse effect" of air pollution and to assure that "any decision to permit increased air pollution" in an area designated as attainment "is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decision-making process." 42 U.S.C. § 7470(1), (5).

84. Under the Clean Air Act, a PSD permit must be issued before an owner or operator may begin construction of any "major emitting facility," including a "major modification" to an "existing major stationary source." 42 U.S.C. § 7475(a)(1); 40 C.F.R. § 51.166(a)(7)(ii)–(iii).

85. A fossil fuel-fired steam electric plant with a heat input capacity of more than 250 million British thermal units per hour ("MMBtu/hr") is a major stationary source if it emits or has the potential to emit at least 100 tons per year of any pollutant subject to the PSD program. 40 C.F.R. § 51.166(b)(1)(i)(A).

86. A major modification is a "physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase [of a regulated pollutant] and a significant net emissions increase of that pollutant from the major stationary source." *Id.* § 51.166(b)(2)(i).

87. Determining whether a proposed change at an existing major source will be a "major modification" requiring a PSD permit is a two-step process. At Step One, the analysis focuses on whether the "project" alone would result in a "significant emissions increase" of a regulated pollutant. 42 U.S.C. § 7411(a)(4); 40 C.F.R. § 51.166(a)(7)(iv)(A), (b)(2)(i).

88. An "increase" caused by a physical change to the existing source occurs "when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant." 40 C.F.R. § 51.166(b)(3)(vii).

89. Emissions increases are considered "significant" for this purpose if they exceed certain *de minimis* levels, specified by federal regulation, in tons per year for each pollutant. *Id.* § 51.166(b)(23)(i).

90. If a project will cause a "significant emissions increase," then the analysis turns to Step Two: whether the change would result in a "significant *net* emissions increase" of the pollutant. *Id.* § 51.166(a)(7)(iv)(A) (emphasis added).

91. A "net emissions increase" is calculated by combining the amount of emissions increased by the project with all source-wide changes in emissions (increases and decreases) that are "contemporaneous with the particular change" and meet other requirements. *Id.* § 51.166(b)(3)(i). A "contemporaneous" increase or decrease is one that occurs "within a reasonable period (to be specified by the state) before the date that the increase from the particular change occurs." *Id.* § 51.166(b)(3)(ii).

**2. PSD requirements apply to significant increases in emissions of certain regulated pollutants.**

92. Pollutants regulated under the PSD program include any pollutant for which EPA has promulgated NAAQS. 40 C.F.R. § 51.166(b)(49)(i). Other pollutants regulated under the PSD program include volatile organic compounds ("VOC"), sulfuric acid mist ("$H_2SO_4$"), hydrogen sulfide, fluorides, and greenhouse gases in the form of carbon dioxide equivalents ("$CO_2e$"). *Id.* § 51.166(b)(23)(i), (b)(48)–(49).

93. A project that will cause a net increase of forty tons per year or more of VOC must be permitted as a major modification for ozone. *Id.* § 51.166(b)(23)(i).

94. $NO_X$ is regulated as criteria pollutant and as a precursor to ozone. A project that will cause a net emissions increase of forty tons per year or more of $NO_X$ must be permitted as a major modification for $NO_X$ and for ozone. *Id.* Such a project must also be permitted as a major

modification for $PM_{2.5}$ unless the State demonstrates that NOx emissions do not significantly contribute to the area's ambient levels of $PM_{2.5}$. *Id.* § 51.166(b)(23)(i), (b)(49)(B)(3).

95. A project that will cause a net increase of twenty-five tons per year or more of particulate matter must be permitted as a major modification for particulate matter. *Id.* § 51.166(b)(23)(i).

96. A project that will cause a net increase of fifteen tons per year or more of $PM_{10}$ must be permitted as a major modification for $PM_{10}$. *Id.*

97. A project that will cause a net increase of ten tons or more per year of direct $PM_{2.5}$ must be permitted as a major modification for $PM_{2.5}$. *Id.*

98. A project that will cause a net increase of forty tons per year or more of $SO_2$ must be permitted as a major modification for $SO_2$ and for $PM_{2.5}$. *Id.*

99. A project that will cause a net increase of 100 tons per year or more of CO must be permitted as a major modification for CO. 40 C.F.R. *Id.*

100. A project that will cause a net increase of 75,000 tons per year or more of $CO_2e$ must be permitted as a major modification for greenhouse gases (the aggregate group of carbon dioxide, nitrous oxide, methane, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride) if the project will also cause a significant emissions increase of another pollutant subject to PSD. *Id.* § 51.166(b)(48)(iv)(B).

**3. Major modifications to sources in attainment areas must comply with emissions limitations reflecting the best available control technology.**

101. Permits for new major sources and "major modifications" must impose emission limitations referred to as best available control technology, or BACT, limits for each pollutant subject to PSD review.

102. The Clean Air Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility." 42 U.S.C. § 7479(3); *see* 40 C.F.R. § 51.166(b)(12).

103. The Clean Air Act defines an "emission limitation" as a requirement that "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice, or operational standard." 42 U.S.C. § 7602(k).

104. The application of BACT limits is required for "each proposed emissions unit at which a net emissions increase in the pollutant would occur." 40 C.F.R. § 51.166(j)(3).

105. Federal rules prohibit the circumvention of PSD review by proposing or accepting enforceable emissions limits to remain below applicable PSD thresholds and subsequently relaxing those limits. *Id.* § 51.166(r)(2). This includes, for example, a restriction on hours of operation that reduces a project's net emissions increase to be below the applicable thresholds for a major modification but is later removed from the permit. *Id.* In such cases, PSD requirements apply upon relaxation of the limit "as though construction had not yet commenced on the source or modification." *Id.*

**4. Major modifications to sources in attainment areas must conduct specific analyses and allow for public input before beginning actual construction.**

106. The proponent of a new major source or major modification must perform a "source impact analysis" to demonstrate that construction and operation of the new or modified source "would not cause or contribute to" an exceedance of any ambient air quality standard or otherwise

significantly deteriorate ambient air quality. 42 U.S.C. § 7475(a)(3)(B), (e)(1), (e)(3)(B); 40 C.F.R. § 51.166(k), (m).

107. The preconstruction source impact analysis must take into account existing pollution levels based on "continuous air quality monitoring data gathered for purposes of determining whether emissions of that pollutant would cause or contribute to a violation of the [NAAQS]." 40 C.F.R. § 51.166(m)(1)(iii).

108. If the source impact analysis demonstrates the project will cause or contribute to a NAAQS exceedance, then the permittee must revise its project as needed to ensure NAAQS compliance, or the permitting agency must deny the application. *Id.* § 51.166(k).

109. The PSD preconstruction review process also includes an assessment of visibility impacts on nearby national parks, wilderness areas, and other special places, collectively referred to as Class I areas. 42 U.S.C. § 7475(d)(2).

110. This assessment of potential visibility impacts must be subject to consultation with federal agencies responsible for managing and protecting Class I areas. If a federal agency finds that the project's emissions will cause an "adverse impact" on visibility in such an area, the project cannot be permitted. *Id.* § 7475(d)(2)(C)(ii).

111. Permitting agencies must ensure that proposed projects undergo these required air quality analyses as part of the preconstruction review, following processes, methodological standards, and guidelines for analysis set at the federal level for each pollutant subject to PSD review. 40 C.F.R. § 51.166(l)–(m).

112. The Clean Air Act also requires that states provide "adequate procedural opportunities for informed public participation in the decision making process" for all sources subject to PSD review. 42 U.S.C. § 7470(5). The Act prohibits construction of new major sources

and major modifications absent "a public hearing" hosted by the permitting authority "with opportunity for interested persons . . . to appear and submit written or oral presentations on the air quality impact of [the new] source, alternatives thereto, control technology requirements, and other appropriate considerations." *Id.* § 7475(a)(2).

**B. Tennessee SIP Requirements for Preconstruction and Operating Permits for Major Modifications**

113. Tennessee's federally approved SIP prohibits construction of any new major stationary source or major modification "unless the requirements of [Tennessee's PSD regulations] have been met." Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1.

114. Tennessee's federally approved SIP prohibits construction of any new major stationary source or major modification "without a permit that states that the major stationary source or major modification will meet [the] requirements" of Tennessee's PSD regulations. *Id.* at 1200-03-09-.01(4)(c)3.

115. Tennessee's PSD regulations apply to new major stationary sources and major modifications. *Id.* at 1200-03-09-.01(4)(a)1. Other new and modified sources must still apply for and receive a permit before beginning construction of "a new air contaminant source or the modification of an air contaminant source which may result in the discharge of air contaminants." *Id.* at 1200-03-09-.01(1)(a) (2013).

116. The obligation to obtain an appropriate permit is ongoing and applies even to those sources that began construction before obtaining the appropriate permit. *Id.* at 1200-03-09-.01(1)(e); *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410, 419 (6th Cir. 2007).

117. The regulatory requirements for minor sources and minor modifications under Tennessee's minor New Source Review program are less stringent than those for major

modifications and new major sources. *See* Tenn. Comp. R. & Regs. 1200-03-02-.01(aa)4. (1993), 1200-03-09-.01(4)(a)2.

118. The Tennessee SIP's definition of "major modification" and two-step assessment of whether a "physical change in or change in method of operation of" an existing source constitutes a "major modification" for purposes of PSD permitting mirrors the federal process. *Id.* at 1200-03-09-.01(4)(b)2., (4)(b)4., (4)(b)49.; *see supra* ¶¶ 86–91.

119. In Tennessee, a "contemporaneous" increase or decrease is one that "occurs between . . . [t]he date five years before a completed application for the particular change is submitted" and "[t]he date that the increase from the particular change occurs." Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(b)4.(ii).

120. Tennessee's SIP uses the same thresholds as federal PSD regulations for "significant" net emissions increases in regulated pollutants. *Id.* at 1200-03-09-.01(4)(b)24.; *see* 40 C.F.R. § 51.166(b)(23); *supra* ¶¶ 92–100.

121. Tennessee's SIP requires that major modifications to existing major stationary sources comply with preconstruction analysis and emissions limitations requirements, including evaluation and application of BACT limits that reflect the maximum degree of reduction achievable. Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(c)3.; *id.* at 1200-03-09-.01(4)(j)3. (2013).

122. Tennessee's SIP requires the owner or operator of a proposed major modification to include in its permit application "[a] detailed description as to what system of continuous emission reduction is planned for the source or modification, emission estimates, and any other information necessary to determine that [BACT] would be applied where required by this paragraph." *Id.* at 1200-03-09-.01(4)(e)2.(i)(III).

123. BACT is required at the emissions-unit level for each criteria pollutant subject to PSD. *Id.* at 1200-03-09-.01(4)(j)3. (2013), (b)53.

124. For a major modification, BACT must be applied to every emissions unit undergoing a physical or operational change that results in any net emissions increase of a pollutant subject to PSD. *Id.* at 1200-03-09-.01(4)(j)3. (2013).

125. Facility operators may be required to study and install multiple pollution control technologies to minimize different pollutant emissions from a single unit. *See id.*

126. Proponents of new major sources or major modifications in Tennessee must also perform a "source impact analysis" demonstrating the modification "would not cause or contribute to" an exceedance of any NAAQS. *Id.* at 1200-03-09-.01(4)(e)1.(i)–(ii); *see supra* ¶¶ 106–108.

127. The source impact analysis, which typically must involve robust air dispersion modeling, enables the permitting agency to evaluate whether a source's emissions will result in or exacerbate unhealthy air quality. *See* Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(e), (4)(k).

128. The Technical Secretary of Tennessee's Air Pollution Control Board cannot issue a permit for a new major source or major modification if it "would result in a violation of the ambient air quality standards" or "interfere with attainment or maintenance of a national ambient air quality standard in a neighboring state." *Id.* at 1200-03-09-.01(1)(e).

129. Tennessee's SIP requires an assessment of visibility impacts on nearby national parks, wilderness areas, and other Class I areas. *Id.* at 1200-03-09-.01(4)(n). If emissions from a major modification will cause an "adverse impact" on visibility in any such areas, the project's permit application can be denied. *Id.* at 1200-03-09-.01(4)(n)2.; *see supra* ¶¶ 109–10.

130. Tennessee's SIP requires the same meaningful opportunities for public participation required by the federal PSD regulations, including the opportunity to review and comment on the Technical Secretary's draft permit. Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(l); *see supra* ¶ 112.

131. Tennessee's SIP requires that "[c]onstruction of a new air contaminant source or the modification of an air contaminant source which may result the discharge of air contaminants must be in accordance with the approved construction permit application[.]" Tenn. Comp. R. & Regs. 1200-03-09-.01(1)(d) (2013).

132. Under Tennessee's SIP, the Technical Secretary's issuance of a construction permit "shall not relieve any owner or operator of the responsibility to comply fully" with all applicable PSD requirements, including the requirement to apply BACT. *Id.* at 1200-03-09-.01(4)(a)5.; *see Nat'l Parks Conservation Ass'n*, 480 F.3d at 418.

133. Tennessee's SIP requirements cannot be circumvented through methods such as "stagger[ing] installation and operation of a facility to avoid coverage by a standard that applies only to operations larger than a specified size." Tenn. Comp. R. & Regs. 1200-03-09-.03(2) (2009).

134. Tennessee's SIP also prohibits the circumvention of PSD review by proposing or accepting enforceable emissions limits to remain below applicable PSD thresholds and subsequently relaxing those limits. *Id.* at 1200-03-09-.01(4)(a)6. This includes, for example, a restriction on hours of operation that reduces a project's net emissions increase to be below the applicable thresholds for a major modification but is later removed from the permit. *Id.* In such cases, PSD requirements apply upon relaxation of the limit "as though construction had not yet commenced on the source or modification." *Id.*

135. Tennessee's SIP prohibits any attempts to undergo a sham process in which a permittee constructs or begins to construct a purported minor modification with the intent to

operate as a major source or major modification. *Id.* at 1200-03-09-.03(2) (2009); *see* 40 C.F.R. § 51.166(r)(2); Requirements for the Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 54 Fed. Reg. 27274, 27280–81 (June 28, 1989).

**C. Citizen Suit Enforcement Provisions**

136. The Clean Air Act's citizen suit provision authorizes "any person" to sue for violations of an "emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1).

137. The Act defines "emission standard or limitation under this chapter" in part as any "emission limitation, standard of performance or emission standard," any standard or limitation established "under any applicable State implementation plan approved by the [EPA]" and "any requirement to obtain a permit as a condition of operations." *Id.* § 7604(f)(1), (4).

138. The requirement to operate in compliance with emission limits that reflect the maximum degree of reduction achievable for the facility, or BACT, is an "emission limitation" or "standard" which is set forth under the Clean Air Act and adopted and incorporated into the federally approved Tennessee SIP. *Id.* § 7479(3); 40 C.F.R. § 51.166(b)(12), (j); Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(b)53., (j).

139. Tennessee's SIP imposes an ongoing duty for new major sources and major modifications to operate in compliance with emission limits that reflect BACT, regardless of the limits contained in any preconstruction permit obtained by the source. *Nat'l Parks Conservation Ass'n*, 480 F.3d at 418 (citing Tenn Comp. R. & Regs. 1200-03-09-.01(4)(a)5., (4)(j)3.).

140. Tennessee's SIP requirement for the proponent of a major modification to obtain a PSD permit containing appropriate BACT limits is a "requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4); *Nat'l Parks Conservation Ass'n*, 480 F.3d at 418–419.

141. An action under 42 U.S.C. § 7604(a)(1) may proceed after a sixty-day notice period, unless the EPA or the State "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order" whose violation has been alleged. *Id.* § 7604(b)(1).

142. The Clean Air Act also authorizes "any person" to sue "any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under [the PSD Program]." 42 U.S.C. § 7604(a)(3).

143. An action under 42 U.S.C. § 7604(a)(3), for allegations regarding any person who proposes to construct or constructs a new major source or major modification without a PSD permit, may proceed immediately, without a notice period, and without limitation regarding any civil action commenced by EPA or the State. *See id.* § 7604(b).

144. In a citizen suit filed pursuant to 42 U.S.C. § 7604(a), the federal district court has jurisdiction to enforce emission standards or limitations and apply appropriate civil penalties for each day of violation. *Id.* §§ 7413(e), 7604(a).

145. For each violation established, a penalty of $124,426 per day may be imposed. *Id.* § 7413(b); 40 C.F.R. § 19.4 tbl.1.

## V. FACTUAL BACKGROUND

### A. Defendant TVA is the owner and operator of the Cumberland Coal Plant and the Cumberland Gas Plant, subject to Defendant Cumberland LLC's leasehold interest and contractual control over modifications to the Cumberland Gas Plant.

146. The Cumberland Coal Plant and Gas Plant are located on a 2,388-acre property known as the Cumberland Reservation in Stewart County at 815 Cumberland City Road, Cumberland City, Tennessee 37050.

147. Upon information and belief, at all times relevant to the violations alleged in this Complaint, TVA was and continues to be the owner of the real property located at 815 Cumberland

City Road, Cumberland City, Tennessee 37050, where the Cumberland Coal Plant and Cumberland Gas Plant are located.

148. Upon information and belief, at all times relevant to the violations alleged in this Complaint, TVA was and continues to be the owner and operator of the Cumberland Coal Plant.

149. Upon information and belief, at all times relevant to the violations alleged in this Complaint, TVA was and continues to be the owner and operator of the Cumberland Gas Plant, subject to a lease agreement and related contracts with Defendant Cumberland LLC.

150. Pursuant to the Construction Management Agreement between TVA and Cumberland LLC, TVA is responsible for the design, permitting, construction, start-up, testing, and commissioning of the Cumberland Gas Plant.

151. Upon information and belief, TVA retains authority to manage, direct, and/or conduct operations and decision-making related to the construction and operation of all pollutant-emitting activities for both Plants, except that the Construction Management Agreement restricts TVA from making any material modifications to the features or specifications of the Cumberland Gas Plant without the written consent of Cumberland LLC.

152. The operating permit for the Cumberland Coal Plant, Title V Permit No. 577855, issued on July 1, 2021, lists TVA as the sole permittee.

153. The minor New Source Review permit for the Cumberland Gas Plant, Permit No. 981885, issued on March 27, 2025, lists TVA as the sole permittee.

### B. TVA decided to retire the aging Cumberland Coal Plant by the end of 2028 and received a minor New Source Review permit for construction of the Gas Plant based on that retirement date.

154. In 2021, TVA completed an evaluation of its aging coal fleet. Following that evaluation, TVA staff recommended retiring its entire coal fleet by 2038.

155. Although TVA considered the option of continuing to operate the Cumberland Coal Plant indefinitely, in 2023 it formally decided to retire one coal-fired boiler by the end of 2026 and the other coal-fired boiler by the end of 2028.

156. According to TVA, its fleetwide evaluation "confirm[ed] that the aging coal fleet is among the oldest in the nation and is experiencing deterioration of material condition and performance challenges." Environmental Impact Statement for Cumberland Fossil Plant Retirement, Notice of Intent, 86 Fed. Reg. 25933, 25934 (May 11, 2021).

157. Due to those cost and reliability challenges, TVA concluded that the Cumberland Coal Plant should be retired. Cumberland Fossil Plant Retirement Environmental Impact Statement, Record of Decision, 88 Fed. Reg. 3767, 3767 (Jan. 20, 2023).

158. To replace generation from one of the retiring coal-fired boilers, TVA decided to construct the Cumberland Gas Plant: "a new natural gas-fueled, 1,450-MW [combined-cycle] plant[.]" 88 Fed. Reg. at 3770.

159. The Cumberland Gas Plant is comprised of two gas-fired combined-cycle electric generating units (Source Nos. 55 and 56), two gas-fired auxiliary boilers (Source Nos. 57 and 58), three gas-fired fuel heaters (Source Nos. 60, 61, and 62), a diesel-fired emergency fire pump engine (Source No. 59), and a wastewater cooling tower (Source No. 63). The minor New Source Review permit for the Cumberland Gas Plant also includes modifications of the two existing oil-fired auxiliary boilers at the Coal Plant (Source No. 17) to support the phased shutdown of the two coal-fired boilers.

160. Each of the combined-cycle electric generating units within the Cumberland Gas Plant has a heat input capacity of 4,903 MMBtu/hr and consists of one combustion turbine, one heat recovery steam generator, and one duct burner.

161. Each gas-fired auxiliary boiler has a heat input capacity of 75.0 MMBtu/hr and provides supplemental steam for one of the heat recovery steam generators.

162. In October 2022, TVA submitted an air permit application to TDEC's Division of Air Pollution Control, seeking authorization to construct the Cumberland Gas Plant as a minor modification of the retiring Coal Plant.

163. To support its classification as a minor modification, TVA represented that the Gas Plant's construction and the Coal Plant's retirement constituted a single project and that the Coal Plant's historical emissions could be subtracted from the Gas Plant's emissions to avoid PSD review.

164. TDEC accepted TVA's proposal to treat the Gas Plant's construction as part of the same project as the Coal Plant's retirement (hereafter referred to as the "Cumberland Fossil Fuel Project"), allowing TVA to subtract the retiring Coal Plant's baseline emissions from the new Gas Plant's increase in emissions and thus permit the Gas Plant's construction as a minor modification of the Coal Plant.

165. This minor modification classification allowed TVA to bypass PSD review for the entire Cumberland Fossil Fuel Project and avoid the heightened air quality protections and public participation requirements associated with major modifications.

166. On June 20, 2023, the Technical Secretary of the Tennessee Air Pollution Control Board issued minor New Source Review Permit No. 980891, authorizing the Cumberland Fossil Fuel Project as proposed by TVA.

167. Permit No. 980891 included Condition G18, requiring TVA to cease operating one of the coal-fired boilers once the shakedown periods for both new combined-cycle units were complete, but by December 31, 2026, at the latest.

168. Permit No. 980891's Condition G18 also required TVA to cease operating the remaining coal-fired boiler within two years after the shakedown periods for both new combined-cycle units were complete, but by December 31, 2028, at the latest.

169. A few months later, TVA submitted an application for a modification of Permit No. 980891, seeking to relax limitations applicable to the two existing oil-fired auxiliary boilers' operations.

170. While this permit modification request increased the net emissions increases associated with the project, TVA continued to represent that PSD did not apply because the Cumberland Fossil Fuel Project included retirement of both coal-fired units and would not cause a significant net emissions increase.

171. TDEC circulated a public notice for TVA's application for a permit modification in January 2024. TDEC did not publish or seek comment on its analysis of the application or a draft version of the permit modification.

172. In December 2024, TVA submitted a revised application for a permit modification, requesting several additional changes, including removal of the requirement to cease operating one of the coal-fired boilers by the end of 2026.

173. In this revised application, TVA reiterated that it would cease operating one of the coal-fired boilers upon completion of the shakedown period for the two new combined-cycle units.

174. TDEC did not publish public notice of TVA's revised application for a permit modification. Instead, without providing an opportunity for public comment, in March 2025, the Technical Secretary issued minor New Source Review Permit No. 981885, authorizing the revised Cumberland Fossil Fuel Project as proposed by TVA. *See* **Ex. B**, State of Tenn. Air Pollution

Control Bd. Dep't of Env't & Conservation, Permit to Construct / Modify Air Contaminant Source(s) No. 981885 (Mar. 27, 2025).

175. Permit No. 981885 includes Condition G18, which requires TVA to "idle" one of the coal-fired boilers once the shakedown periods for both new combined-cycle units are complete, and to cease operating both coal-fired boilers by December 31, 2028.

176. In all of its minor New Source Review permit applications, TVA claimed that major New Source Review and the related PSD rules in Tennessee's SIP did not apply because the Cumberland Gas Plant's increased emissions would be sufficiently offset by the reduction in emissions from the Cumberland Coal Plant's retirement such that the net emissions increases would not exceed the legal threshold for a major modification.

177. The Technical Secretary's issuance of Permit No. 981885 expressly relied on TVA's agreement to permanently retire the Cumberland Coal Plant by the end of 2028.

178. In material accompanying Permit No. 981885, TDEC explained that the Technical Secretary issued a minor New Source Review permit authorizing construction of the Cumberland Gas Plant because "there is a reasonable presumption that TVA's decision to build new Gas [units] and decommission existing Coal [units], at the same major stationary source, would be jointly planned activities that are technically and functionally interconnected." *See* **Ex. C**, State of Tenn. Air Pollution Control Bd. Dep't of Env't & Conservation, Construction Permit Summary Report: Permit No. 981885 at 1, Attach. 1 at 2 (Mar. 27, 2025).

179. 173. TDEC also explained that "[b]ecause TVA is decommissioning its Coal [units] less than three years after all new Gas [units] commence commercial operation, TDEC presumes that these activities are substantially related and constitute a single project, in reliance on relevant EPA rules." *Id.*

### C. After promising to retire the Coal Plant in exchange for receiving a minor New Source Review permit to construct the Gas Plant, TVA reversed course.

180. TVA began construction of the Cumberland Gas Plant in the summer of 2024 pursuant to the initial minor New Source Review permit, Permit No. 980891.



*Fig. 1.* ***Ex. D****, Satellite Image of Cumberland Gas Plant, Aug. 17, 2024 (Planet Labs PBC)*

181. On April 14, 2025, less than three weeks after issuance of the revised minor New Source Review permit, Permit No. 981885, TVA published a post on social media showing that substantial progress had been made on construction of the Cumberland Gas Plant.

182. Less than a year later, and days before the TVA Board of Directors were scheduled to meet on February 11, 2026, TVA published a supplemental environmental impact statement identifying that its new "preferred alternative" plan for the Cumberland Fossil Fuel Project was to

continue operating the Coal Plant beyond 2028 in addition to construction and operation of the new Gas Plant.

183. TVA's February 2026 supplemental environmental impact statement confirmed that construction of the Gas Plant was ongoing.

184. On February 11, 2026, the TVA Board passed a resolution authorizing TVA to continue operating the Coal Plant together with the new Gas Plant, directing "TVA staff to apply for any permits" needed to operate the Cumberland Coal Plant alongside the Cumberland Gas Plant, and authorizing the expenditure of fiscal year 2026 funds and the execution of procurement contracts to enable the continued operation of the Coal Plant beyond 2028. *See* **Ex. E**, TVA Board Resolution at 2–3; **Ex. F**, Excerpt from Proceedings Held Feb. 11, 2026 at 2:6–9, 4:3–11, 6:10–16, 8:4–13. The TVA Board resolution also noted that "TVA staff anticipates filing an application in 2026 for a PSD permit for Cumberland." **Ex. E** at 2.

185. To comply with the Board's resolution, TVA identified several life-extending modifications required to continue operating the Cumberland Coal Plant beyond its 2028 retirement date and estimated that these modifications would require an investment of more than $700 million.

### D. TVA applied for a PSD permit for the Cumberland Gas Plant after construction was well underway and several new units were already operating.

186. On March 12, 2026, TDEC staff publicly posted a draft PSD modeling protocol for TVA's newly revised Cumberland Fossil Plant Project involving the Coal Plant's continued operation alongside the new Gas Plant.

187. On March 25, 2026, TVA submitted a monitoring plan to TDEC for the new gas turbines' continuous emissions monitoring system, which listed tentative dates for commencing

commercial operation of the new turbines in bypass mode: April 16, 2026, for the first turbine, and May 15, 2026, for the second turbine.

188. In notification forms that TVA submitted in April and May 2026 pursuant to Condition G8 of Permit No. 981885, TVA certified under penalty of perjury that the startup date for one new turbine (Source No. 55) was April 28, 2026, and the startup date for two new fuel heaters and one new gas-fired boiler (Source Nos. 60, 61, and 57) were April 21, April 23, and May 7, 2026, respectively.

189. On May 20, 2026, after these four new emission units started operating, a consulting firm submitted a PSD permit application on TVA's behalf for the revised Cumberland Fossil Fuel Project. This application recognizes that TVA's decision to continue operating the Cumberland Coal Plant beyond 2028 precludes TVA from using the Coal Plant's historical emissions to offset the Gas Plant's emissions and that a PSD permit is therefore required for the project.

190. TVA's PSD application includes calculations showing the project requires a PSD permit as a major modification to an existing major source due to significant net emissions increases above the applicable thresholds for CO, $NO_X$, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

191. After submitting the PSD application to TDEC, TVA notified EPA that it had (1) commenced commercial operation of the first new turbine (Source No. 55) on May 29, 2026, and (2) commenced operation of the second new turbine (Source No. 56) on May 31, 2026. These notifications specified that both turbines' emissions were released into the atmosphere through the bypass stacks rather than being routed through the add-on pollution control systems.

192. On June 8, 2026, TVA submitted another required notification form to TDEC, certifying under penalty of perjury that the startup date for the second new turbine (Source No. 56) occurred on May 31, 2026.

193. On June 17, 2026, TVA notified EPA that it had commenced commercial operation of the second new turbine on June 14, 2026.

194. By letter dated June 18, 2026, TDEC notified TVA that it had determined the PSD permit application was "incomplete." **Ex. G**, Letter from James P. Johnston, TDEC Div. of Air Pollution Control, to Darren Crutcher, Plant Manager, TVA Cumberland Fossil Plant (June 18, 2026). TDEC's letter listed nine categories of information needed to complete the application, including Tier I and Tier II air quality modeling reports, supporting documentation for TVA's emission calculations and proposed emission limits for the new units at the Gas Plant, and information about the life-extending renovations at the Coal Plant. *Id.* at 1.

195. TDEC's June 18 letter deeming the PSD application incomplete states: "Please be advised that construction or modification of the source cannot begin until you are in receipt of the issued construction/modification permit." *Id.*

196. According to public reporting, TVA operated the new emission units at the Cumberland Gas Plant to provide power to the electric grid "in late June and early July" of 2026. Kenya Anderson, *TVA's Cumberland Gas Plant Nears Completion, Sends Power*, Clarksville Leaf-Chronicle (July 31, 2026, at 5:01 CT), https://theleafchronicle.com/story/news/2026/07/31/tva-gas-plant-cumberland-city-tn-grid-power/90944771007/. TVA's plant manager Travis Mitchell reportedly stated that the Gas Plant "sent out about 700 megawatts of power" to the electric grid "several times during the testing stage," including on July 21, 2026. *Id.*

197. TVA constructed and is now operating its two new combustion turbines, two new fuel heaters, and one new auxiliary boiler at the Cumberland Gas Plant, for which TVA concedes the potential emissions exceed the thresholds for a major modification to an existing major source, without having received a PSD permit.

198. To date, there have been no public hearing or public participation opportunities provided by TDEC on TVA's revised Cumberland Fossil Fuel Project involving construction and operation of the Cumberland Gas Plant without retiring the Coal Plant.

**E. The Cumberland Coal and Gas Plants each have the potential to emit significant amounts of harmful pollutants, the combination of which poses a serious threat to public health.**

199. The Cumberland Coal Plant is fossil fuel-fired steam electric plant with a heat input capacity of more than 250 MMBtu/hr and has the potential to emit more than 100 tons per year of several pollutants subject to PSD. As a result, the Cumberland Coal Plant is an existing major stationary source of air pollution at TVA's Cumberland Reservation.

200. In 2025 alone, the Cumberland Coal Plant emitted 5,209 short tons of $SO_2$, 4,065 short tons of $NO_X$, and a total of more than 10.2 million short tons of $CO_2e$.

201. According to TDEC's 2022 regional haze plan, emissions from the Cumberland Coal Plant "significantly" impact visibility in the following Class I areas: Sipsey Wilderness Area in Alabama, which is approximately 142 miles from the plant; Shining Rock Wilderness Area in North Carolina, which is approximately 282 miles from the plant; Linville Gorge Wilderness Area in North Carolina, which is approximately 320 miles from the plant; and Breton Wilderness Area in Louisiana, which is approximate 453 miles from the plant.

202. According to TDEC's 2022 regional haze plan, emissions from the Cumberland Coal Plant also impact visibility in the following Class I areas: Otter Creek Wilderness Area, Dolly Sods Wilderness Area, Mammoth Cave National Park, Cohutta Wilderness Area, Wolf Island

Wilderness Area, Shenandoah National Park, Chassahowitzka Wilderness Area, Okefenokee Wilderness Area, Joyce Kilmer-Slickrock Wilderness Area, Great Smoky Mountains National Park, Mingo Wilderness Area, Great Gulf Wilderness Area, Presidential Range-Dry River Wilderness Area, Cape Romain Wilderness Area, James River Face Wilderness Area, St. Marks Wilderness Area, Seney Wilderness Area, Acadia National Park, Lye Brook Wilderness, Hercules-Glades Wilderness Area, Upper Buffalo Wilderness Area, and Theodore Roosevelt National Park.

203. According to the National Park Service's comments on TDEC's 2022 regional haze plan, the Cumberland Coal Plant contributes more than any other facility in Tennessee to visibility impairment in the following Class I areas: Great Smoky Mountains National Park, Mammoth Cave National Park, and Shenandoah National Park.

204. In its 2024 application for a minor New Source Review permit for the Cumberland Fossil Fuel Project, TVA reported the following baseline actual emissions for the two coal-fired boilers (Source Nos. 1 and 2): 4,193 tons per year of $NO_X$; 1,119 tons per year of CO; 8,053 tons per year of $SO_2$; 226 tons per year of PM; 779 tons per year of total $PM_{10}$; 1,344 tons per year of total $PM_{2.5}$; 134 tons per year of VOC; 1,068 tons per year of SO3 as $H_2SO_4$; and 11,098,550 tons per year of $CO_2e$.

205. In its 2024 application for a minor New Source Review permit for the Cumberland Fossil Fuel Project, TVA estimated the following potential emissions for the new units at the Gas Plant (Source Nos. 55–63): 2,373 tons per year of $NO_X$; 271 tons per year of CO; 26 tons per year of $SO_2$; 183 tons per year of PM; 225 tons per year of total $PM_{10}$; 225 tons per year of total $PM_{2.5}$; 116 tons per year of VOC; and 5,173,416 tons per year of $CO_2e$.

206. In material accompanying minor New Source Review Permit No. 981885, TDEC summarized the following potential combined emissions for the two new combustion turbines at

the Gas Plant (Source Nos. 55 and 56): 2,347.2 tons per year of $NO_X$; 237.6 tons per year of CO; 25.4 tons per year of $SO_2$; 181.1 tons per year of filterable PM; 218.8 tons per year of $PM_{10}$; 218.8 tons per year of $PM_{2.5}$; 111.8 tons per year of VOC; and 5,804,298 tons per year of $CO_2e$.

207. TVA's 2024 emissions estimates assumed each new combustion turbine (Source Nos. 55 and 56) would operate in simple-cycle or bypass mode for a maximum of 500 hours per train per year.

208. Minor New Source Review Permit No. 981885 does not include any limit on the number of hours that the new combustion turbines (Source Nos. 55 and 56) can operate in simple-cycle or bypass mode.

209. In its May 2026 application for a PSD permit for the revised Cumberland Fossil Fuel Project, TVA estimated the following potential emissions for the new units at the Gas Plant (Source Nos. 55–63), assuming emission rates that reflect application of TVA's proposed BACT limits: 519.11 tons per year of $NO_X$; 294.87 tons per year of CO; 25.47 tons per year of $SO_2$; 175.94 tons per year of filterable PM; 221.73 tons per year of total $PM_{10}$; 221.70 tons per year of total $PM_{2.5}$; 114.49 tons per year of VOC; and 5,098,371 tons per year of $CO_2e$.

210. In its May 2026 application for a PSD permit for the revised Cumberland Fossil Fuel Project, TVA estimated that emissions from the modified oil-fired auxiliary boilers (Source No. 17) will increase to the following: 83.81 tons per year of $NO_X$; 40.86 tons per year of CO; 1.59 tons per year of $SO_2$; 31.43 tons per year of filterable PM; 25.44 tons per year of total $PM_{10}$; 13.65 tons per year of total $PM_{2.5}$; 1.50 tons per year of VOC; and 171,193 tons per year of $CO_2e$.

211. In its May 2026 application for a PSD permit for the revised Cumberland Fossil Fuel Project, TVA estimated that the combination of the new units (Source Nos. 55–63) and the modified oil-fired auxiliary boilers (Source No. 17) will result in the following net emissions

increases that exceed the applicable thresholds for a major modification requiring PSD review: 585.33 tons per year of $NO_X$; 322.01 tons per year of CO; 202.09 tons per year of filterable PM; 240.26 tons per year of total $PM_{10}$; 228.44 tons per year of total $PM_{2.5}$; 115.73 tons per year of VOC; and 5,240,791 tons per year of $CO_2e$.

212. Now that TVA has decided to keep the Coal Plant operating alongside the new Gas Plant, total emissions from TVA operations at the Cumberland Reservation will be far higher than the representations TVA made in its permit applications upon which minor New Source Review Permit Nos. 980891 and 981885 were based.




*Figure 2. Potential Emissions Changes, TVA Cumberland Site*

213. The air pollutants subject to PSD that are emitted by the Cumberland Coal and Gas Plants have adverse effects on air quality and human health.

214. Exposure to $PM_{2.5}$ can have adverse impacts on the respiratory, cardiovascular, and nervous systems, and can cause cancer and premature death. Adverse health effects have been observed at all studied concentrations of $PM_{2.5}$, even at levels below the applicable NAAQS.

215. Exposure to $PM_{10}$ can have adverse impacts on the respiratory and cardiovascular systems and can cause premature death. Exposure to $PM_{10}$ is particularly harmful for children, older adults, and people with asthma.

216. Exposure to CO can reduce the amount of oxygen in the bloodstream and have adverse impacts on critical tissues and organs, especially the heart. Exposure to CO is particularly harmful for elderly people, fetuses, and people with heart or lung disease, anemia, or diabetes.

217. Exposure to $NO_X$ can exacerbate respiratory diseases, especially asthma, and is particularly harmful for children and older adults. $NO_X$ has effects on cardiovascular, respiratory, reproductive, and nervous systems. $NO_X$ can also react with other compounds to form small particles and contribute to PM pollution.

218. Exposure to $SO_2$ can have adverse impacts on the respiratory system and is particularly harmful for children and people with asthma. $SO_2$ can also react with other compounds to form small particles and contribute to PM pollution.

219. Formaldehyde is one type of VOC that adversely affects human body tissues, irritating the eyes, nose, throat, and skin, and leading to both acute and chronic health effects. Exposure to formaldehyde, among other VOC, is associated with increased incidences of cancer. Children and adolescents have an increased risk of experiencing health hazards from exposure to VOC like formaldehyde, as their respiratory and immune systems are still in development.

220. $NO_X$ and VOC react with heat and sunlight to form ground-level ozone, which causes a variety of adverse health effects, including diminished lung function, airway inflammation, increased risk of respiratory infection, and increased frequency and severity of asthma attacks. Ozone exposure is particularly harmful for children and people with asthma.

221. $NO_x$ and $SO_2$ react with water, oxygen, and other atmospheric chemicals to form sulfuric and nitric acids, which cause acid rain. Acid rain damages aquatic ecosystems by decreasing the pH of water, which threatens aquatic life and can prevent fish eggs from hatching. Acid rain also damages vegetation, including trees and agricultural crops, by stripping nutrients from foliage and removing minerals and nutrients from soils. Acid rain can also leach metals from the soil, which contributes to groundwater contamination.

222. $NO_x$, $SO_2$, and PM absorb and scatter sunlight across long distances, which creates regional haze that impairs visibility. Regional haze detracts from the clarity and color of scenic views in special places like national parks and wilderness areas.

223. Emission rates for $NO_X$, CO, and VOC are higher when the Cumberland Gas Plant's new combustion turbines (Source Nos. 55 and 56) operate in simple-cycle or bypass mode, as the exhaust is routed through the bypass stack instead of the heat recovery steam generator (which contains the selective catalytic reduction system and catalytic oxidizer), thus bypassing those add-on pollution controls.

224. Stewart County, Tennessee, where the Cumberland Coal Plant and Cumberland Gas Plant are located, is currently designated as attainment or unclassifiable for all applicable NAAQS for the criteria pollutants emitted by the Plants. 40 C.F.R. § 81.343.

225. There are no active regulatory ambient air monitors for ozone, $NO_x$, $PM_{10}$, $PM_{2.5}$, CO, or $SO_2$ in Stewart County.

226. The closest active regulatory ambient air monitor for ozone is in Fairview, Tennessee (Site ID No. 47-187-0106), more than forty miles away from the Plants.

227. The closest active regulatory ambient air monitor for nitrogen dioxide, a subset of NOx, is in north Nashville, Tennessee (Site ID No. 47-037-0011), more than fifty miles away from the Plants.

228. The closest active regulatory ambient air monitor for $PM_{10}$ is in east Nashville, Tennessee (Site ID No. 47-037-0023), more than fifty miles away from the Plants.

229. The closest active regulatory ambient air monitor for $PM_{2.5}$ is in north Clarksville, Tennessee (Site ID No. 47-125-2001), more than twenty miles away from the Plants.

230. The closest active regulatory ambient air monitor for CO is in southeast Nashville, Tennessee (Site ID No. 47-037-0040), more than fifty miles away from the Plants.

231. The closest active regulatory ambient air monitor for $SO_2$ is in southeast Nashville, Tennessee (Site ID No. 47-037-0040), more than fifty miles away from the Plants.

**F. The State Determined TVA's Continued Construction of the Cumberland Gas Plant Violates the Tennessee SIP.**

232. On August 21, 2026, the Technical Secretary of the Tennessee Air Pollution Control Board and TVA executed an administrative Consent Order related to one of the categories of violations alleged herein.

233. Section XLV of the administrative Consent Order documents the Technical Secretary's finding that TVA violated Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3 by continuing to construct the Cumberland Gas Plant without a PSD permit after notifying TDEC of the change in its project.

234. Under the administrative Consent Order, TVA agreed to pay $202,650 in civil penalties to TDEC in response to the Technical Secretary's finding that TVA violated Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3.

235. The administrative Consent Order does not prohibit TVA from continuing to construct the Cumberland Gas Plant without a PSD permit.

236. The administrative Consent Order does not contain any findings by the Technical Secretary regarding the violations alleged herein related to TVA's operation of the Cumberland Gas Plant without a PSD permit and without application of BACT.

237. The administrative Consent Order does not prohibit TVA from continuing to operate the Cumberland Gas Plant without a PSD permit and without application of BACT.

238. The administrative Consent Order documents the Technical Secretary's reservation of the right to assess additional civil penalties and damages and to pursue further enforcement action including for monetary and injunctive relief.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Construction of the Cumberland Gas Plant without a PSD Permit)**

239. The preceding paragraphs are realleged and incorporated herein by reference.

240. At all times relevant to this claim, TVA was and continues to be the owner of the real property located at 815 Cumberland City Road, Cumberland City, Tennessee 37050, where the Cumberland Coal Plant and Cumberland Gas Plant are located.

241. At all times relevant to this claim, TVA was and continues to be the owner and operator of the Cumberland Gas Plant, subject to a lease agreement and related contracts with Cumberland LLC.

242. Pursuant to the Construction Management Agreement between TVA and Cumberland LLC, TVA is responsible for the design, permitting, construction, start-up, testing, and commissioning of the Cumberland Gas Plant.

243. Upon information and belief, TVA retains authority to manage, direct, and/or conduct operations and decision-making related to the Cumberland Fossil Fuel Project, except that the Construction Management Agreement restricts TVA from making any material modifications to the features or specifications of the Cumberland Gas Plant without the written consent of Cumberland LLC.

244. In Stewart County, Tennessee, PSD review is required for each regulated pollutant for which a project at an existing major source will cause a significant net increase in emissions.

245. According to TVA, construction of the Cumberland Gas Plant is a modification of the Cumberland Coal Plant, which is an existing major stationary source for the following pollutants: $NO_X$, CO, $SO_2$, PM, $PM_{10}$, $PM_{2.5}$, VOC, $H_2SO_4$, and $CO_2e$.

246. TVA no longer plans to retire the Cumberland Coal Plant by the end of 2028 and instead plans to operate the Cumberland Coal and Gas Plants concurrently.

247. When the Cumberland Coal Plant's baseline actual emissions are not subtracted from the Cumberland Gas Plant's potential emissions, the net increases in emissions exceed the applicable significance thresholds for a major modification requiring PSD review for $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

248. TVA's construction of the Cumberland Gas Plant as a modification of the Cumberland Coal Plant constitutes a "major modification" because it results in both a significant emissions increase and a significant net emissions increase of $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

249. Upon information and belief, TVA began actual construction of the Cumberland Gas Plant on or about August 17, 2024.

250. TVA did not apply for a PSD permit for any pollutants prior to beginning construction of the Cumberland Gas Plant.

251. TVA did not obtain a PSD permit for any pollutants prior to beginning construction of the Cumberland Gas Plant.

252. TVA applied for a PSD permit for the Gas Plant's increased emissions of $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$ on May 20, 2026, more than twenty months after it began actual construction of the Gas Plant.

253. TDEC deemed TVA's PSD permit application incomplete on June 18, 2026.

254. Upon information and belief, as of the date of this Complaint, TVA has not submitted all information needed for a complete PSD permit application, including documentation to support its emissions estimates, adequate BACT analyses, and adequate air dispersion modeling.

255. As of the date of this Complaint, TVA has not obtained a PSD permit authorizing the construction or operation of the Cumberland Gas Plant.

256. Upon information and belief, as of the date of this Complaint, TVA's construction of three new emission units at the Cumberland Gas Plant (Source Nos. 58, 59, and 63) is ongoing.

257. Under the Clean Air Act and the Tennessee SIP, TVA is prohibited from beginning construction of a major modification of an existing major source without obtaining a PSD permit for all regulated pollutants for which the project will cause a significant net emissions increase.

258. Under the Clean Air Act and the Tennessee SIP, TVA is prohibited from beginning construction of a major modification of an existing major source before satisfying all applicable PSD requirements, including the performance of preconstruction monitoring and air dispersion modeling to demonstrate the project will not cause or contribute to air pollution in excess of any NAAQS or otherwise significantly degrade air quality, and the evaluation of emission limits that

reflect the maximum degree of reduction achievable for the facility when using modern pollution control technologies and processes.

259. TVA began construction of the Cumberland Gas Plant without a PSD permit and without complying with all applicable preconstruction requirements for a major modification.

260. TVA continued constructing the Cumberland Gas Plant, without a PSD permit and without complying with all applicable preconstruction requirements for a major modification, after publicly abandoning its plan to retire the Cumberland Coal Plant.

261. TVA's construction activities at the Cumberland Gas Plant violate the Clean Air Act, 42 U.S.C. § 7475(a)(1), and Tennessee's SIP, Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3.

262. TVA's violations of the Clean Air Act, 42 U.S.C. § 7475(a)(1), and Tenenssee's SIP, Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3, recur each day that TVA continues construction of new emission units at the Cumberland Gas Plant without a PSD permit. *Nat'l Parks Conservation Ass'n*, 480 F.3d at 419.

263. The administrative Consent Order executed by the Technical Secretary of the Tennessee Air Pollution Control Board and TVA on August 21, 2026, documents the Technical Secretary's finding that TVA violated Tenn. Comp. R. & Regs. 1200-03-09-.01(4)(a)1 and 1200-03-09-.01(4)(c)3 by continuing to construct the Cumberland Gas Plant without a PSD permit after notifying TDEC of the change in its project.

264. The administrative Consent Order does not prohibit TVA from continuing to construct the Cumberland Gas Plant without a PSD permit.

265. The administrative Consent Order did not arise from "a civil action in a court of the United States or a State." 42 U.S.C. § 7604(b)(1)(B).

266. The diligent prosecution bar set forth in 42 U.S.C. § 7604(b)(1)(B) does not apply to claims brought pursuant to 42 U.S.C. § 7604(a)(3).

267. Plaintiffs can commence a civil action against Defendants for these unlawful construction activities at the Cumberland Gas Plant pursuant to 42 U.S.C. § 7604(a)(3).

268. Unless restrained by an Order of this Court, these violations and similar violations of Tennessee's SIP will continue.

269. The court has jurisdiction to enforce the Clean Air Act and Tennessee's SIP requirements by granting declaratory and injunctive relief and assessing civil penalties of up to $124,426 per day for each violation. 42 U.S.C. §§ 7413(b), 7604(a); 28 U.S.C. §§ 2201(a), 2202, 1355(a); 40 C.F.R. § 19.4 tbl.1.

## SECOND CLAIM FOR RELIEF

**(Operation of the Cumberland Gas Plant without a PSD Permit or Application of BACT)**

270. The preceding paragraphs are realleged and incorporated herein by reference.

271. At all times relevant to this claim, TVA was and continues to be the owner of the real property located at 815 Cumberland City Road, Cumberland City, Tennessee 37050, where the Cumberland Coal Plant and Cumberland Gas Plant are located.

272. At all times relevant to this claim, TVA was and continues to be the owner and operator of the Cumberland Gas Plant, subject to a lease agreement and related contracts with Cumberland LLC.

273. Pursuant to the Construction Management Agreement between TVA and Cumberland LLC, TVA is responsible for the design, permitting, construction, start-up, testing, and commissioning of the Cumberland Gas Plant.

274. Upon information and belief, TVA retains authority to manage, direct, and/or conduct operations and decision-making related to the Cumberland Fossil Fuel Project, except that

the Construction Management Agreement restricts TVA from making any material modifications to the features or specifications of the Cumberland Gas Plant without the written consent of Cumberland LLC.

275. In Stewart County, Tennessee, PSD review is required for each regulated pollutant for which a project at an existing major source will cause a significant net increase in emissions.

276. According to TVA, construction of the Cumberland Gas Plant is a modification of the Cumberland Coal Plant, which is an existing major stationary source for the following pollutants: $NO_X$, CO, $SO_2$, PM, $PM_{10}$, $PM_{2.5}$, VOC, $H_2SO_4$, and $CO_2e$.

277. TVA no longer plans to retire the Cumberland Coal Plant by the end of 2028 and instead plans to operate the Cumberland Coal and Gas Plans concurrently.

278. When the Cumberland Coal Plant's baseline actual emissions are not subtracted from the Cumberland Gas Plant's potential emissions, the net increases in emissions exceed the applicable significance thresholds for a major modification requiring PSD review for $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

279. TVA's construction of the Cumberland Gas Plant as a modification of the Cumberland Coal Plant constitutes is a "major modification" because it results in both a significant emissions increase and a significant net emissions increase of $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

280. TVA began operating the first new gas-fired fuel heater at the Cumberland Gas Plant (Source No. 60) on April 21, 2026.

281. TVA began operating the second new gas-fired fuel heater at the Cumberland Gas Plant (Source No. 61) on April 23, 2026.

282. TVA began operating the first new gas-fired combustion turbine at the Cumberland Gas Plant (Source No. 55) on April 28, 2026.

283. TVA began operating the first new gas-fired auxiliary boiler at the Cumberland Gas Plant (Source No. 57) on May 7, 2026.

284. TVA applied for a PSD permit for the Gas Plant's increased emissions of $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$ on May 20, 2026, after it had begun operating four new emission units at the Cumberland Gas Plant.

285. TVA commenced commercial operation of the first new gas-fired combustion turbine at the Cumberland Gas Plant (Source No. 55) on May 29, 2026.

286. TVA began operating the second new gas-fired combustion turbine at the Cumberland Gas Plant (Source No. 56) on May 31, 2026.

287. TVA commenced commercial operation of the second new gas-fired combustion turbine at the Cumberland Gas Plant (Source No. 56) on June 14, 2026.

288. TDEC deemed TVA's PSD permit application incomplete on June 18, 2026.

289. Upon information and belief, TVA continues to operate these five new emission units at the Cumberland Gas Plant (Source Nos. 55–57, 60–61).

290. According to material accompanying minor New Source Review Permit No. 981885, the potential emissions for the two new combustion turbines at the Cumberland Gas Plant (Source Nos. 55 and 56) exceed the applicable thresholds for a major modification subject to PSD for the following pollutants: $NO_X$, CO, PM, $PM_{10}$, $PM_{2.5}$, VOC, and $CO_2e$.

291. Upon information and belief, as of the date of this Complaint, TVA has not submitted all information needed for a complete PSD permit application, including documentation to support its emissions estimates, adequate BACT analyses, and adequate air dispersion modeling.

292. As of the date of this Complaint, TVA has not obtained a PSD permit authorizing construction or operation of the Cumberland Gas Plant.

293. Under the Tennessee SIP, TVA is prohibited from operating a major modification of an existing major source without obtaining a PSD permit for all regulated pollutants for which the project will cause a significant net emissions increase.

294. Under the Tennessee SIP, TVA is prohibited from operating a major modification of an existing major source without application of BACT, *i.e.*, emission limits that reflect the maximum degree of reduction achievable for the facility when using up-to-date pollution control technologies and processes.

295. TVA did not obtain a PSD permit for any pollutants prior to beginning operation of five new emission units at the Cumberland Gas Plant (Source Nos. 55–57, 60–61).

296. TVA began operating five new emission units at the Cumberland Gas Plant (Source Nos. 55–57, 60–61) after publicly abandoning its plan to retire the Cumberland Coal Plant, without a PSD permit and without application of BACT limits.

297. TVA's operation of these five new emission units at the Cumberland Gas Plant (Source Nos. 55–57, 60–61), without a PSD permit and without application of BACT limits, violates Tennessee's SIP, Tenn. Comp. R. & Regs. 1200-03-09-.01(1)(e) and 1200-03-09-.01(4)(j)3.

298. TVA's violations of Tennessee's SIP, Tenn. Comp. R. & Regs. 1200-03-09-.01(1)(e) and 1200-03-09-.01(4)(j)3, recur each day that TVA continues operating new emission units at the Cumberland Gas Plant without a PSD permit and without application of BACT limits. *Nat'l Parks Conservation Ass'n*, 480 F.3d at 418–19.

299. More than sixty days have passed since Plaintiffs served the required notice of these violations on June 25, 2026. *See* **Ex. A** at 1; 42 U.S.C. § 7604(b)(1)(A).

300. The administrative Consent Order executed by the Technical Secretary of the Tennessee Air Pollution Control Board and TVA on August 21, 2026, does not contain any findings by the Technical Secretary regarding the violations alleged herein related to TVA's operation of the Cumberland Gas Plant without a PSD permit and without application of BACT.

301. The administrative Consent Order does not prohibit TVA from continuing to operate the Cumberland Gas Plant without a PSD permit and without application of BACT.

302. The administrative Consent Order did not arise from "a civil action in a court of the United States or a State." 42 U.S.C. § 7604(b)(1)(B).

303. Plaintiffs can commence a civil action against Defendants for these unlawful operational activities at the Cumberland Gas Plant pursuant to 42 U.S.C. § 7604(a)(1).

304. Unless restrained by an Order of this Court, these violations and similar violations of Tennessee's SIP will continue.

305. The court has jurisdiction to enforce Tennessee's SIP requirements by granting declaratory and injunctive relief and assessing civil penalties of up to $124,426 per day for each violation. 42 U.S.C. §§ 7413(b), 7604(a); 28 U.S.C. §§ 2201(a), 2202, 1355(a); 40 C.F.R. § 19.4 tbl.1.

## VII. PRAYER FOR RELIEF

Plaintiffs Appalachian Voices and Sierra Club respectfully request that the Court:

(a) declare that Defendants have violated and continue to violate the Clean Air Act and the Tennessee SIP;

(b) permanently enjoin Defendants from constructing or operating any new or modified emission units at the Cumberland Reservation unless and until the Technical Secretary

of the Tennessee Air Pollution Control Board issues a PSD permit that authorizes their construction and operation;

(c) order Defendants to comply with emission limits that reflect BACT, *i.e.*, the maximum degree of emission reduction achievable using up-to-date pollution control technologies and processes at the new and modified emissions units at the Cumberland Reservation;

(d) order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act and the Tennessee SIP alleged above;

(e) assess a civil penalty against Defendants of up to $124,426 per day, per violation;

(f) award Plaintiffs their costs of litigating this action, including reasonable attorney and expert witness fees, pursuant to 42 U.S.C. § 7604(d); and,

(g) grant such other relief as the Court deems just and proper.

DATE: September 8, 2026

Respectfully submitted,

*s/ Delaney King*
Delaney King, TN BPR No. 041512
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
dking@selc.org

*Counsel for Appalachian Voices and Sierra Club*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I served a copy of the foregoing Complaint for Declaratory and Injunctive Relief on the following entities, pursuant to 42 U.S.C. § 7604(c)(3), Fed. R. Civ. P. 4, and L.R. 4.01(d)(1), via U.S. certified mail, return receipt requested:

Mike Skaggs, President & CEO
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902

Cogency Global Inc., Registered Agent
Cumberland Combined Cycle Generation, LLC
850 New Burton Road, Suite 201
Dover, DE 19904

Todd Blanche, Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Braden H. Boucek, United States Attorney
Middle District of Tennessee
719 Church Street, Suite 3300
Nashville, TN 37203

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20004

*s/ Delaney King*
Delaney King

*Counsel for Appalachian Voices and Sierra Club*